UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
NATASHA SMITH, JEFF LYSIUS,
and KHYMALI LYSIUS,

                            Plaintiffs,         14 CV 5841 (MKB) (VMS)

      -against-

                                     **FIRST AMENDED COMPLAINT**

CITY OF NEW YORK, LAWRENCE
HAMMOND, SOPHIA CARSON, HUGO
ORTEGA, and EMRAH ATES,

                                     **PLAINTIFFS DEMAND**
                     Defendants.       **A TRIAL BY JURY**
-------------------------------X

        Plaintiffs Natasha Smith, Jeff Lysius, and Khymali Lysius, by their attorneys, Lumer & Neville, as and for their First Amended Complaint, hereby allege as follows, upon information and belief:

## PARTIES, VENUE and JURISDICTION

        1.    At all times hereinafter mentioned, plaintiffs were adult residents of Kings County, within the State of New York.

        2.    At all relevant times hereinafter mentioned, defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

        3.    At all relevant times hereinafter mentioned, defendant Lawrence Hammond was employed by the City of New York as a member of the NYPD. Hammond

is sued herein in his official and individual capacities.

4. At all relevant times hereinafter mentioned, defendant Sophia Carson, Shield No. 27627, was employed by the City of New York as a member of the NYPD. Carson is sued herein in her official and individual capacities.

5. At all relevant times hereinafter mentioned, defendant Hugo Ortega, Tax Number 935438, was employed by the City of New York as a member of the NYPD. Ortega is sued herein in his official and individual capacities.

6. At all relevant times hereinafter mentioned, defendant Emrah Ates, Tax Number 942967, was employed by the City of New York as a member of the NYPD. Ates is sued herein in his official and individual capacities.

7. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

8. Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where the defendant City of New York resides, and where the majority of the actions complained of herein occurred.

**RELEVANT FACTS**

9. As of November 13, 2013, plaintiffs Natasha Smith and Jeff Lysius resided together in a 2 bedroom apartment located at 604 Georgia Avenue, in Kings County (the "Premises").

10. The Premises was one of two apartments located on the second floor

of the building. There were also apartments located on the first floor, as well as the basement. The latter was accessed through a separate entrance

11. Also residing with plaintiffs were three infants, ZJ, JJ, and NJ, who, as of November 13, 2013, were 10, 7, and 4 years old.

12. The three infants are the biological children of plaintiff Natasha Smith, and they are cared for and reside with both Ms. Smith and Jeff Lysius.

13. Plaintiffs Smith and Jeff Lysius slept in bedroom 1 and the three infants slept in bedroom 2.

14. Plaintiff Khymali Lysius is the adult nephew of Jeff Lysius.

15. Khymali Lysius did not reside at the Premises as of November 13, 2013.

16. On the night of November 12, 2013, plaintiff Kymali Lysius stayed in the Premises and slept on the couch in the living room.

17. On November 13, 2013, at or around 6:00 to 6:15 a.m., plaintiffs and the infants were woken by a loud bang and the sound of police offices forcibly entering the Premises.

18. It is believed that individual defendants Ortega and Ates were among those that first entered the Premises, and that Hammond and Carson entered sometime thereafter.

19. As of November 13, 2013, each of the individually named defendants was assigned to the NYPD's Narcotics Bureau Brooklyn North unit ("NBBN").

20. Hammond had the rank of Lieutenant, Ortega and Ates were both Detectives, and Carson then had the rank of Police Officer.

21. Plaintiffs heard at least one officer yelling words to the effect of, "Search warrant!" and "William Williams!" or "William C. Williams."

22. It is plaintiffs' understanding that William Williams is the name of the tenant who resided in the Premises prior to the plaintiffs.

23. The defendants' entry was predicated on a search warrant that issued on November 7, 2013.

24. The warrant was obtained by defendant Carson based on false or materially incomplete or deceptive factual statements by Carson, either directly to the Criminal Court of the City of New York, which issued the warrant, or to the prosecutors who assisted in procuring the warrant, which were designed to mislead the issuing Court into wrongly concluding that sufficient legal cause existed to justify the issuance of the warrant.

25. At or about the same time that defendants were entering and searching the Premises, other defendants and/or other members of the NYPD entered the basement apartment of John Dixon and Alexandria Hyland.

26. The entry into the basement apartment was made pursuant to a separate warrant that was procured by Carson at about the same time as the warrant for the Premises.

27. The plaintiffs were all seized, handcuffed, and arrested.

28. The defendants, along with several other officers then searched the

Premises.

29. Plaintiffs were transported to a local NYPD station house, where they remained in defendants' custody while their arrests were processed.

30. Natasha Smith's children were left with a neighbor on the first floor.

31. Plaintiffs were then transported to Central Booking, where they were further imprisoned by defendants for a period of hours.

32. Eventually the Kings County District Attorney's Office declined to prosecute plaintiff Khymali Lysius, and he was summarily released from Central Booking.

33. While plaintiffs were imprisoned by the defendants, defendant Carson completed arrest paperwork in which she expressly claimed that she had been told by defendant Ates that he personally observed plaintiffs Smith and Jeff Lysius in possession of crack cocaine and that crack cocaine had been recovered from a night stand in their bedroom.

34. Carson further claimed that she had been told by Ortega that he recovered marijuana and "numerous empty ziplock bags" from a night stand in the plaintiffs' bedroom.

35. These claims were materially false and defendants knew them to be false at the time they were made.

36. Carson forwarded these false allegations to both the Kings County District Attorney ("KCDA") and the Special Narcotics Prosecutor ("SNP") in order to justify the arrest and to persuade the KCDA and/or SNP to initiate the plaintiffs' criminal

prosecution.

37. Ates and Ortega both knew that Carson would be utilizing their false statements of fact to justify their arrest of plaintiffs and to persuade prosecutors to initiate plaintiffs' criminal prosecution.

38. Carson, Ates, and Ortega each knew and understood that the KCDA and/or SNP, in evaluating whether to commence a criminal prosecution against the plaintiffs, would rely on the truthfulness of their factual claims and statements, and would proceed on as assumption that all of these factual statements and claims were truthful in all material respects, and that no material or exculpatory information had been withheld.

39. As a direct result of these false allegations by the defendants, the plaintiffs were each criminally charged by the KCDA under dockets 2013KN087260 and 2013KN087261 with one misdemeanor count of criminal possession of a controlled substance, one misdemeanor count of using drug paraphernalia, and one non-criminal charge of unlawful possession of marijuana under NY Penal Law § 221.05, punishable only by fine.

40. The case was never presented to a grand jury and plaintiffs were not indicted. However, both Natasha Smith and Jeff Lysius were required to return to court on threat of imprisonment.

41. While plaintiffs were in defendants' custody, Hammond threatened Smith that he would have Smith's children taken from her if Smith did not somehow cooperate with defendants.

42. On or between November 13-15, 2013, one of the defendants

contacted the City of New York's Administration for Children's Services ("ACS") or caused ACS to be contacted, and advised ACS that plaintiff and Jeff Lysius were endangering the three infants.

43. On or about November 15, 2013, Carson told an employee of ACS that Carson had obtained a search warrant for the Premises because the plaintiffs' residence was known for selling narcotics and was under surveillance. Carson further stated to ACS that crack cocaine was recovered in the plaintiffs' bedroom, where it was accessible to the infants, and that "they" had previously purchased crack cocaine on three occasions from Jeff Lysius at the Premises while Ms. Smith and her children were present.

44. ACS undertook an initial investigation that failed to reveal any evidence that plaintiffs were keeping, using, or selling any narcotics in the Premises. However, based entirely on the ACS investigator's presumption that the defendants' allegations about drug sales being made from, and crack cocaine being found inside, the Premises, the allegations against plaintiffs were deemed substantiated.

45. These allegations were false, as defendants knew that drugs were not being sold out of the Premises, that no crack cocaine was found inside the Premises, and that neither Jeff Lysius nor anyone else was storing narcotics, selling narcotics or allowing narcotics to be sold from the Premises.

46. As a result, on November 25, 2013, ACS initiated a neglect proceeding against both Natasha Smith and Jeff Lysius under docket NN-32157-13 in Family Court of the State of New York, Kings County.

47. The plaintiffs were forced to defend themselves therein on threat of termination of Ms. Smith's parental rights while the criminal prosecution was also ongoing.

48. On February 18, 2014, all criminal charges against Natasha Smith and Jeff Lysius were dismissed on the KCDA's own motion and the prosecution terminated in their favor.

49. On or about May 9, 2014, the Family Court matter was adjourned in contemplation of dismissal, and was dismissed on or about August 8, 2014.

50. It was objectively unreasonable for the defendants to arrest any of the three plaintiffs, as there was no evidence that any of the them had engaged in any unlawful conduct, nor could the defendants have reasonably believed that such cause existed.

51. At no time did any of the individual defendants take any steps to intervene in, prevent, or otherwise limit the heretofore misconduct engaged in against any of the plaintiffs.

52. The individual defendants intentionally and deliberately gave false statements and/or failed to file accurate or corrective statements, or otherwise failed to report the conduct of the defendants who engaged in the misconduct described herein as required.

53. On or about February 9, 2015, plaintiffs Jeff Lysius and Khymali Lysius each accepted Offers of Judgment made by the City of New York pursuant to Federal Rule of Civil Procedure 68 for $25,001, plus reasonable legal fees and costs.

54. Shortly thereafter, judgments were entered against the City of New

York and in favor of Jeff Lysius and Khymali Lysius in accordance with the terms of the Offers of Judgment.

55. As of the date of the pleading, the issue of the Lysius plaintiffs' legal fees and costs remains outstanding.

56. That at all times relevant herein, the defendants were on duty and acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

**FIRST CAUSE OF ACTION**

57. Plaintiffs repeat the allegations contained in the preceding paragraphs as though stated fully herein.

58. The individual defendants willfully and intentionally entered the Premises without a lawfully obtained warrant and conducted a search thereof with no legal basis and no reasonable basis to believe that said search was not unconstitutional, and thus violated plaintiffs' right to be free from unreasonable searches.

59. The individual defendants falsely arrested all three plaintiffs and caused them to be falsely imprisoned, by arresting them without probable cause, and without any reasonable basis to believe that probable cause existed for their arrest.

60. The individual defendants fabricated evidence and lied about the circumstances of the plaintiffs' arrest, and then forwarded the fabricated evidence to prosecutors, causing plaintiffs Smith and Jeff Lysius to be maliciously prosecuted and denied

their right to a fair trial.

61. Each of the individual defendants actively participated in the above misconduct or otherwise failed to intervene or take reasonable steps to protect the plaintiffs from the unconstitutional conduct of the other defendants.

62. By so doing, the individual defendants, individually and collectively, subjected the plaintiffs generally, and Natasha Smith in particular, to unlawful searches of person and property, false arrest and imprisonment, malicious prosecution, and the deprivation of her right to a fair trial through the use of fabricated evidence, and thereby violated plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

63. By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

## SECOND CAUSE OF ACTION

64. Plaintiffs repeat the allegations contained in the preceding paragraphs as though stated fully herein.

65. Defendants deliberately forwarded fabricated evidence to ACS for the purpose of having plaintiff Smith's children removed from her custody, and/or causing the initiation of an action in Family Court against plaintiffs Smith and Jeff Lysius.

66. Defendants' forwarding of fabricated or misleading evidence to ACS

caused plaintiffs Smith and Jeff Lysius to be maliciously subjected to child neglect proceedings in Family Court prosecutors, depriving them both of their right to due process and to a fair trial, and interfering and threatening to interfere with plaintiff Smith's liberty interest in the custody and parenting of her children.

67. By so doing, the individual defendants subjected plaintiffs to malicious use and abuse of process, the deprivation of their right to due process and Smith's liberty interest in maintaining custody of her infant children, and their right to a fair trial through the use of fabricated evidence or the withholding of material and exculpatory evidence, and thereby violated plaintiffs' rights under the First, Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

68. By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

### THIRD CAUSE OF ACTION

69. Plaintiffs repeat the allegations contained in the preceding paragraphs as though stated fully herein.

70. The individual defendants' entry into the Premises, arrest of the three plaintiffs, and subsequent actions, and failure to act, with respect to the criminal prosecutions of the plaintiffs, were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests

made without regard to probable cause.

71. More precisely, under this policy or plan, officers within the Narcotics Division generally, and NBBD in particular, would knowingly make arrests of individuals regardless of whether there was any factual basis for the charges. The arresting officer(s) would then make false statements of fact as to seeing the individual(s) being arrested in actual or constructive possession of the narcotics in question.

72. The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers.

73. In addition, members of the Narcotics Division are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the Narcotics Division routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

74. The NYPD generally, and NBBD in particular, tracks the number of arrests made by each officer but does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, members of the Narcotics Division are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

75. More precisely, under this policy or plan, officers are encouraged or

pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges. The officer(s) would then fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

76. The purpose of this policy or plan was to generate large numbers of arrests within the individual commands therein, in order to create a false or misleading impression of positive activity by their officers and satisfying internal quotas.

77. In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, summonses issued, and other, similar criteria. Members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

78. The policy or plan was kept in effect from, at least, 2006 through, at least, the date of plaintiff's arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecutions, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

79. Rather than take steps to abolish this plainly unconstitutional and

unlawful police, the municipal defendant continued to tacitly endorse this policy of deliberate misconduct.

80. In October 2011, following a bench trial in New York State Supreme Court, Kings County, under indictment number 06314-2008, former NYPD narcotics officer Jason Arbeeny was convicted of planting drugs on two individuals and falsifying arrest reports. Before issuing a verdict of guilty, the trial judge scolded the NYPD for what he described as a "widespread culture of corruption endemic in its drug units." The judge further stated that the testimony demonstrated that the NYPD narcotics divisions maintain a "cowboy culture" and that he was "shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed."

81. In an Order dated November 25, 2009, in *Colon v. City of New York,* 09-CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration -- through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department -- there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

82. It is also manifestly clear through the litigation brought in the Eastern and Southern Districts of New York that countless hundreds, if not thousands, of civilians

have alleged that members of the NBBD have deliberately arrested them without probable cause. Thus, even if the municipal defendant was not the architect of the policy causing these unlawful arrests, they were certainly on notice of the practice.

83. It is therefore clear that the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that the City of New York, at the bare minimum, has been on notice was deliberately indifferent to the risk that the undue emphasis on arrest quotas, or minimum activity levels, particularly when coupled with a deliberately indifferent level of supervision, would lead to the violation of individuals' constitutional rights in general, and caused the violation of plaintiffs' rights in particular.

84. By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiffs demand judgment against defendants jointly and severally as follows:

 i. on the first and second causes of action, actual and punitive damages in an amount to be determined at trial;

 ii. on the third cause of action, actual damages in an amount to be determined at trial; and

 iii. statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

 iv. such other relief as the Court deems just and proper.

Dated: March 24, 2015
   New York, New York

        LUMER & NEVILLE
        Attorneys for Plaintiffs
        225 Broadway, Suite 2700
        New York, New York 10007
        (212) 566-5060

        _____
        Michael B. Lumer (ML-1947)